Filed 4/7/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SABRENA ODOM, | B327997 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BC724401 |
| v. | |
| LOS ANGELES COMMUNITY COLLEGE DISTRICT et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert S. Draper, Judge. Reversed and remanded for a new trial.

Meyers Nave, Janice P. Brown, Nadia Bermudez, Nicole Ries Fox and Margaret W. Rosequist for Defendants and Appellants.

Alexander Morrison + Fehr, Tracy L. Fehr; Law Offices of Maryann P. Gallagher and Maryann P. Gallagher for Plaintiff and Respondent.

_____

**SUMMARY**

Defendants appeal from a judgment on a jury verdict awarding $10 million to plaintiff on her claims for sexual harassment, retaliation and related claims. We reverse the judgment, not for lack of substantial evidence, but for prejudicial errors in the admission of irrelevant and damaging "me-too" evidence from a witness who was not similarly situated to plaintiff, and for the equally prejudicial and erroneous admission of 20-year-old newspaper articles and other evidence of the alleged harasser's misdemeanor convictions.

This is an unusual case, due to the significant arbitrary and prejudicial evidentiary rulings of the judge presiding over the trial. After the judgment was entered, defendants filed motions for a new trial (or in the alternative a remittitur) and for partial judgment notwithstanding the verdict (JNOV) (or in the alternative for remittitur). At the hearing on those motions, which were denied, the trial judge initiated extended, bizarre personal comments on racial matters with newly substituted defense counsel (the only Black woman in the courtroom), despite there being no racial issue of any kind in the case. Defendants filed a motion to disqualify the judge for cause and to void his rulings on the motions. After writ proceedings and referral to a neutral judge, the trial judge was disqualified and his rulings on the postjudgment motions were voided.

On this appeal from the judgment, we need not decide whether the trial judge's prejudicially erroneous evidentiary rulings during the trial were motivated, in part, as defendants contend, by "persistent racial and gender bias." It seems clear the judge's rulings were motivated by personal opinions untethered to the rules of evidence. Whatever his motivations may have been, the judge admitted inflammatory evidence without consideration of the evidentiary rules, with undeniable

2

prejudicial effect, thus preventing a fair trial.  We accordingly reverse the judgment and order a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

In October 2018, plaintiff Sabrena Odom filed a complaint for damages, alleging sexual harassment; failure to investigate and prevent sexual harassment; retaliation; and negligent hiring, supervision and retention, in violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12940 et seq.), against defendants Los Angeles Community College District (the District) and Howard Irvin, then the vice president of student services at Los Angeles Southwest College, a community college in the District.  The alleged sexual harassment occurred between February 2017 and October 2017.

**1. The Parties**

Plaintiff was and still is a tenured professor at Southwest College.  She began as an adjunct, and in 2005 was hired full time, working 50/50 as an English instructor and as director of the Student Success Center, which offered tutoring and workshops to enable student learning.  The record contains undisputed evidence recounting plaintiff's background, the achievement of her lifelong dream of teaching at Southwest College, her doctorate, her exceptional performance at the college, her devotion to her students and to the Student Success Center, and the thriving of the center under her leadership.

Defendants are the District and Dr. Irvin, the alleged harasser.  Dr. Irvin joined Southwest College in 2016 as vice president of student services.  He had been an officer with the Los Angeles Police Department for 13 years, until he retired in 1998, 18 years before he joined Southwest College. After leaving the police department, he began a career in community counseling and worked at several community colleges in southern California.  He earned his Ph.D. in 2007.

3

## 2. The Sexual Harassment and Retaliation Evidence

We first recount evidence relating to plaintiff's sexual harassment and retaliation claims, exclusive of the wrongly admitted evidence at issue, which we shall describe later.

### a. Sexual harassment

Plaintiff testified that the sexual harassment began in February 2017 and continued for about eight months.

In February 2017, plaintiff and Dr. Irvin both attended a conference in San Francisco, sponsored by a national organization, Achieving the Dream, that focused on working students and students who were parents. Dr. Irvin had administrative oversight of the Achieving the Dream initiative, for which plaintiff was the faculty representative. Plaintiff had not interacted with Dr. Irvin before she met him at the conference. They met in the lobby bar of the conference hotel and talked about the purpose for the conference and plaintiff's plan for presenting a poster she had prepared for the conference. Plaintiff testified she felt uncomfortable with the casual way Dr. Irvin spoke to her and some of the personal questions he asked her. Dr. Irvin testified he asked plaintiff no personal questions.

Plaintiff testified that dinners with the group from the college attending a conference are typical, but that she did not want to go to dinner with Dr. Irvin alone, so she invited a colleague from another college to attend with her. Plaintiff testified she was "uncomfortable the entire time."

Plaintiff testified that at the end of the conference, Dr. Irvin made her uncomfortable when he asked her if she "was willing to ride home with him in his car from San Francisco back to Los Angeles." She told him she would take her flight back. Dr. Irvin testified he had flown to the Bay area from Los Angeles and rented a car, and he offered plaintiff a ride to the

4

San Francisco airport. She accepted, and he took her to the airport.

Plaintiff testified that between February and September 2017, she met with Dr. Irvin to get his approval for budgetary items, when she needed supplies, and when she was hiring students for the tutoring program. The meetings were sometimes once a week, sometimes every other week, and sometimes multiple times a week. Dr. Irvin would often call her at the spur of the moment to come to his office. The first time, in February 2017, "the discussion quickly went from business to me, to my body, the way I looked." Plaintiff described the meetings with Dr. Irvin, at which he would say things like, "[Y]ou look very sexy today, and I would love to see what your body looked like naked." Dr. Irvin said "multiple times" that he wanted to have sex with plaintiff. He continued to make comments and then he would apologize. "[A]fter I would state that I didn't appreciate what he was saying to me, he would always apologize and say 'I'm just a man' and 'I'm no good. I know I'm no good.'"

Plaintiff testified Dr. Irvin told her that "he had the authority to place people in positions that could be lucrative financially, and that could lead to other opportunities, and he would support me in making those things happen if I followed through with his request for sex."

While sitting at the table in his office, Dr. Irvin "would start . . . to make references to sex and how virile he was and how he would please me, he would squirm in his chair and rub his genitals and just make motions that he was trying to please himself as he was speaking." This "made me feel scared" because "he was much stronger than me" and "I constantly wondered what he would do next." After the meetings, Dr. Irvin would usually insist on walking out with her on the campus and would say things like, " 'I would love to tap that ass.' "

5

When Dr. Irvin asked plaintiff to have sex with him, she "felt violated because I was very clear and direct that I did not want a sexual relationship with him from the first time he asked. And I was just really confused as to why he continued to pressure me into having sex with him."

There was a great deal of other testimony from plaintiff along those lines.

Dr. Irvin testified he had "no recollection" of meeting with plaintiff in his office "any time." Dr. Irvin's calendar showed one meeting with plaintiff on September 28, 2017, but he had "no direct recollection of that." Dr. Irvin testified he never walked around campus with plaintiff or said the things to her that she testified he said. He testified he had no reason to meet with plaintiff "at all" because she reported to Dr. Lawrence Bradford. There was other evidence supporting Dr. Irvin's testimony that plaintiff reported to Dr. Bradford, the vice president of academic affairs, when these events began in February 2017. However, the Student Success Center that plaintiff directed was funded through grants, and "Dr. Irvin was in charge of the funding through those particular grants." Plaintiff testified that in the fall of 2017, she received a notice that "my direct report would be changed to Dr. Irvin."

### b.   Retaliation

In early November 2017, plaintiff went to Denise Noldon, the interim president of Southwest College, and told her she was being sexually harassed by Dr. Irvin, had not complied with his wishes, and felt she was being retaliated against "with an attack against my program as well as my staff." Plaintiff testified that nothing happened in response to her complaint. Dr. Noldon testified that plaintiff did not complain to her about sexual harassment by Dr. Irvin at any of the three meetings Dr. Noldon had with plaintiff.

6

Plaintiff testified to three different acts of alleged retaliation against her "program" and her "staff."

First, plaintiff testified that in the fall of 2017, Dr. Irvin tried to move the Student Success Center from the library to another building, knowing that plaintiff thought the program was "best suited to be in the library." He told her he was going to refurbish the old building (where the center had been located before plaintiff became director). Dr. Irvin tried to convince her "that it was a good thing to do," and she "continuously [told] him the [center] was in its rightful location." Plaintiff also testified that spending $200,000 to refurbish another location "was just an expense that our college really couldn't afford and could have been better utilized with supporting current programs already in existence that needed support."

Dr. Irvin testified about discussions at four or five senior staff meetings (which plaintiff did not attend) about moving the center. He testified that he did not recall "at any time . . . having any discussions at all with [plaintiff] about . . . moving the success center." He learned from Dr. Bradford that Dr. Bradford had told her about it and "she was pissed."

Dr. Noldon, the interim president, testified she initially thought the proposed move was a good idea, but later changed her mind because of the timetable for spending the funds and because plaintiff did not appear to want the move. The proposed relocation did not take place.

Second, Dr. Irvin announced, at an annual meeting for all faculty administrators and staff, that plaintiff would be "working at a new program under student services and one that he would be responsible for." Plaintiff testified that she thought Dr. Irvin "wanted to be my direct report," "wanted to be my supervisor," and while he already "had financial control," she felt he wanted "all control." Dr. Irvin testified that he did in fact make the

7

announcement, and had not had any discussions "with anybody at the senior staff level that that was going to happen," and he had "made an assumption that was inaccurate" based on his understanding of the plans for the relocation of the center. He testified he did not want plaintiff to be under his supervision.

Third, plaintiff testified that on August 22, 2017, Dr. Irvin notified her "that two of [plaintiff's] staff members were fired on the spot with no discussion with me, no discussion with them. They were just notified that they no longer had a job at the beginning of the semester." Plaintiff testified she was "just devastated that someone who was actually in a position to support these students took their livelihood away from them without even discussing it with me or with them."

Dr. Irvin testified that the two student employees were terminated because they had exceeded the District's five-year limit on student employment. Plaintiff testified that students can be reclassified when they exceed the five-year student work limit. She asked Dr. Irvin if the two student workers he terminated, Jennifer Gallegos and Eddie Powell, could be reclassified, and he said no.

Ms. Gallegos testified that she had been employed by the college for six years and six months, and so wondered "why is it just now happening?" She testified that she knew other student workers who were over the five-year mark, so she and Eddie Powell asked Dr. Irvin's secretary, Ms. Byley. Ms. Byley showed them a green sticky note from Dr. Irvin with their names and employment numbers on it, and said he told her to check their hire dates.

Ms. Gallegos testified that Dr. Irvin then gave her a job in the admissions office and told her she was not allowed to go to the Student Success Center. Her station was in the building where Dr. Irvin had his office. Dr. Irvin would watch her from

8

the second floor.  She worked there for about three weeks, "but he made me feel uncomfortable and intimidated" and "stressed out," and she decided "I shouldn't have to go through something like this."

Plaintiff testified that nothing happened after she complained to Dr. Noldon in early November 2017 about Dr. Irvin's sexual harassment and retaliation, so plaintiff went to her union representative, Dr. Sandra Lee, and told her she thought the reason for the contention over the center "was because of Dr. Irvin's harassment of me and retaliation that I didn't comply with him."

Then, at a November 2017 academic senate meeting, the college's administrative vice president, Dan Hall, announced that the center "would start reporting to Dr. Irvin in Student Services effective immediately."  This came as a surprise to the academic senate president, Robert Stewart, who told plaintiff that such a unilateral move was out of compliance with processes for moving programs under a faculty contract.  Immediately after the meeting, Mr. Stewart, Dr. Lee (plaintiff's union representative) and plaintiff went to the president's office to seek clarity about the decision, and the meeting was contentious.

3.    **Plaintiff's Internal Complaint, the Investigation and the Findings**

On December 4, 2017, a few days after the contentious meeting in Dr. Noldon's office, plaintiff filed a written internal complaint, reporting Dr. Irvin's unwanted sexual advances and retaliation against her for not complying with them.  Her complaint included allegations that her work environment was unsafe.

Muriel Alford, a compliance officer for the District, was appointed to conduct an investigation, which she completed five months later.  During Ms. Alford's investigation, plaintiff

9

responded to Ms. Alford's multiple written requests for information. In December 2017, among many other questions, plaintiff was asked to describe how her work atmosphere had become a hostile environment. Among other things, she wrote:

"I felt that I could not trust administrators at [Southwest College]. Each morning before arrival at work, I experienced severe stomachaches, headaches, and I have trouble sleeping at night. My thoughts are consumed with being sexually harassed and retaliated against by [Southwest College] administration."

Another question asked plaintiff to describe how her emotional distress was manifested. She wrote in part: "My emotional stress is manifested by feelings of fear, disbelief and anxiety. I often think of being trapped by Dr. Irvin and unable to escape. I think of him holding me hostage against my will at gun point. I feel detached and often reflect on the past comforts of working as [a District] employee. I feel as if I am grieving the career I once loved, and it brings forth emotional mood swings." Plaintiff received and answered a second set of questions in late January 2018.

In addition to the two sets of questions, to which plaintiff provided detailed answers, Ms. Alford again asked for further information in writing (to "describe the sexual advances and state the unwanted comments"). Plaintiff provided that information, and Ms. Alford interviewed plaintiff for at least two hours in February 2018. Plaintiff testified that during the interview, Ms. Alford "made me feel as if I was wasting her time. And she really didn't show any compassion towards listening to what I had to say." During the interview, Ms. Alford asked her, "Why would you continue to have meetings with him alone in his office and not complain to someone about his harassment? Why did you frequently visit him instead of e-mail or with someone else in attendance?" Plaintiff answered that she had business to conduct

"that was important, and it had a significant effect on my students' ability to get resources from college that they needed, and he had to approve my request for resources."

After that two-hour interview, Ms. Alford asked for another meeting, and plaintiff asked her what more she needed from plaintiff. Plaintiff received no response for months, until she received a letter advising her there was no evidence to substantiate her claims. She felt betrayed, "not taken seriously, not valued, not supported."

Ms. Alford submitted a report of her investigation, for consideration of the deciding official, on May 8, 2018. Ms. Alford concluded that plaintiff "failed to establish a prima facie case of hostile work environment sexual harassment," as "she was unable to substantiate her allegations based on preponderance of the evidence presented." (Italics omitted.) Ms. Alford also concluded plaintiff failed to establish a prima facie case of retaliation. The report stated that Dr. Irvin "was not responsible for the denial of the request to retain the students," and district policy mandated their termination. The report stated that "[w]hen it was made known that [plaintiff] did not want to relocate the Center the plan did not move forward." The report also concluded plaintiff "did not show that she suffered any tangible harm. Overall, the preponderance of evidence presented does not support a finding that the conduct by respondents Irvin or Noldon, occurred as alleged by [plaintiff]."

Kathleen Burke was the interim deputy chancellor for the District and made the final decision on plaintiff's complaint. On June 8, 2018, Dr. Burke sent a letter to plaintiff notifying her of the results of the Alford investigation. The letter repeatedly stated that plaintiff "failed to provide documentation or testimony that would allow a reasonable person to believe the allegations to be truthful." The letter gave the parties an

11

opportunity to make an oral statement to Dr. Burke before she made the final decision. Dr. Burke testified the purpose of the opportunity to respond was "[i]f any additional information has come up since the time of the investigation that would lead to a change in the decision or influence the final decision, it's an opportunity for the complainant and for the respondent to come meet with the final decision maker." Plaintiff did not request a meeting.

Dr. Burke never met with Ms. Alford about the allegations and never met with plaintiff. She met with Dr. Irvin, whom she had known for three or four years, in June 2018. Dr. Burke relied on Ms. Alford's report, which did not include witness statements; she relied on Ms. Alford's summary of what the witnesses said.

Notably, in her internal college complaint, plaintiff had identified "frequent[]" meetings alone with Dr. Irvin in his office during "the week of September 4th and September 11, 2017," when she was trying to get him to reconsider the firing of her two student workers. In her report, Ms. Alford stated the complaint alleged meetings occurred "[o]n" those dates. In her factual findings, Ms. Alford stated that "[s]ome of the dates of meetings submitted by the complainant with the exception of one date could not be substantiated. For example, complainant used dates when the college was closed [Labor Day, September 4] or when [according to his work calendar, Dr. Irvin] was not on campus the day of the alleged incident [September 11]." Dr. Burke testified she was unaware that Ms. Alford's statements on this point were wrong. Dr. Burke was unaware of several other pertinent facts, such as Dr. Irvin's re-hiring of Jennifer Gallegos after she had been fired.

Plaintiff testified she felt devastated by the report because "I felt like I was perceived to be a liar and making all this up."

12

## 4. Plaintiff's Complaint and the Trial

Plaintiff filed her complaint in this action in October 2018.

Judge Robert S. Draper presided over a three-week trial in October 2022. There were more than 20 witnesses. Plainly, witness credibility was the key issue for the jury to decide, and the trial court should have carefully weighed the relevance of any evidence offered to impeach a witness against the potential for undue prejudice. The court admitted testimony and documents we conclude should not have been admitted. We now turn to that evidence, as well as other trial-related matters.

### a. The Los Angeles Times articles and Dr. Irvin's misdemeanor convictions

#### i. Background

When plaintiff filed her internal complaint in December 2017, the complaint included a statement that she felt her work environment was unsafe. During Ms. Alford's investigation, her first set of questions included a question asking plaintiff to describe "in specifics what has made you fear for your safety while at work."

Plaintiff's written response explained that during the summer of 2017, someone had slipped an article from The Los Angeles Times (The Times) under her door, with the handwritten words, "Watch Out." (There were actually two articles, one dated Feb. 25, 1998, and the other dated Oct. 30, 1997.) Plaintiff stated that the article "detailed Dr. Irvin's past as an LAPD officer and his conviction of sexual assault. I was already uneasy around him, but after reading the article, I became frightened whenever he was around. I didn't want to become a victim of his like the woman in the article. One day during a meeting with Dr. Irvin, I asked him if he carried a gun. His response was, 'No, but I can get to it when I need it.' Another time, I asked him the same question and he said, 'Of course.' I believe I asked him this

13

question at least 3 times, and I was never comfortable with the answer."

Dr. Irvin's criminal defense attorney testified Dr. Irvin was never convicted of any sex crime, and there was no evidence at trial to support plaintiff's belief that he had been.

Ms. Alford's second set of questions included question No. 10, which asked: "Submit a copy of the L.A. Times article regarding Dr. Irvin. State the reasons why you repeatedly asked him if he carried a gun."

Plaintiff's response appears in trial exhibit No. 19. In response to Ms. Alford's question, plaintiff submitted a copy of the two newspaper articles that had been put under her door. Plaintiff explained that "every current and former police officer carries a gun. I live in fear now, not only on campus, but off campus as well. On campus, I am now hyper vigilant and extremely conscious of my surroundings because I know that Irvin is dangerous and poses a threat to my safety due to my non-compliance to his demands for sexual favors."

### ii. Trial proceedings

During her trial testimony, plaintiff's counsel asked plaintiff to explain more about The Times's articles. Defense counsel objected on hearsay grounds. The court stated, "Well, the L.A. Times is not being admitted for the truth. What the L.A. Times article says is being admitted for her reaction, not admitted for the truth, so it's overruled." However, the court permitted plaintiff's counsel to read from the article and question plaintiff extensively about statements in the article.

Plaintiff testified that she "felt terrified after I read it." She said it "was about Dr. Irvin and how he committed sexual assault against another female police officer." (As noted above, there was no evidence to support plaintiff's belief that Dr. Irvin committed a sexual assault, and defendants had to call Dr. Irvin's

14

defense counsel from 20 years before to testify to that effect.) Plaintiff was questioned and testified about her written responses to Ms. Alford's questions, one of which was: "I dreaded walking to my car at night. I stopped parking in the multilevel structure. I questioned my ability to do my job well. I questioned my 20-year career as an educator. I was constantly aware that there was someone on campus who had a gun and wanted to harm me." (There was no evidence at trial to support plaintiff's testimony that Dr. Irvin had a gun.)

When plaintiff's counsel moved trial exhibit No. 19 into evidence, defense counsel stated that "[w]e have an issue with this particular document." After an unreported sidebar, the court stated: "All right. This has the article referred to attached. It has also a lot of information. [¶] To the extent the exhibit states her belief and what she believed and what she saw, [plaintiff], that would be admitted for the truth. [¶] To the extent it states hearsay, such as the number article [*sic*], it would be admitted for her response from the request from the college."

Plaintiff then testified about her answer to Ms. Alford's question No. 10. Her counsel questioned her about the 1998 article, which stated that a female detective "testified Tuesday that she was concerned and confused about why a police sergeant [Irvin] against whom she had a restraining order for stalking her, he was invited to meet with police chief Bernard Parks in the building where she worked." (McGreevy, *LAPD Detective Testifies Stalker Cop Got Too Close,* The L.A. Times (Feb. 25, 1998).) The article referred to the female detective's "emotional testimony [that] came on the opening day of the criminal trial in which police sergeant Howard Irvin is charged with violating a restraining order that prohibited him from going within 100 yards of the workplace at police headquarters." (*Ibid.*) Plaintiff testified she was "terrified" when she first read the

15

article, and provided it to Ms. Alford at her request "[b]ecause I wanted them to be clear why I was terrified." Plaintiff testified that "this article and what was in it" was "one of the reasons that compelled [her] to complain." The article stated that the female detective " 'told the jury after she ended a five-year relationship with Irvin in June 1996, he continued to contact her against her wishes and threatened her with physical harm.' " (*Ibid.*)

The second newspaper article about Dr. Irvin contained details of three domestic abuse allegations and their consequences. (Krikorian et al., *Officer Was Subject of 3 Domestic Abuse Probes*, The L.A. Times (Oct. 30, 1997).) Plaintiff's counsel referred to this article during plaintiff's testimony, stating: "There's a second article which is smaller, and a little harder to read, but this article is Exhibit 19-08 and 19-09. And I'm just going to show it for identification so the jury can see it. [¶] So this was 'Officer was subject of three domestic abuse probes.' This, again, was included in the information that you provided to [the District] in January of 2018 with regard to Irvin; correct?" Plaintiff responded affirmatively.

During the later cross-examination of Dr. Irvin, he testified he had been accused of domestic violence in 1994 and was suspended from the LAPD for 22 days; was again accused of domestic violence in 1996 and underwent a Board of Rights hearing; was convicted of four misdemeanors, two for disobeying court orders, one for threatening a crime with intent to terrorize, and one for stalking, for each of which he received probation. These all appeared in a "live scan" submitted to Southwest College in February 2016 when he applied for employment there.

Alberto Roman, who was vice chancellor of human resources for the District when Dr. Irvin was hired, testified for the defense about the live scan results and procedures for reviewing live scans during the hiring process. Dr. Roman

16

testified he would look for several things, including "the nature of the misdemeanor or felony, the recency, . . . whether or not it's been expunged or dismissed, and how that particular conviction would relate to the job."  He testified the District had been advised over the years "not to consider those for purposes of rejecting candidates for employment.  [¶]  So if there is a dismissed or expunged misdemeanor, for example, we do not hold that against the candidate to hire them."

On cross-examination, Dr. Roman confirmed that he reviewed Dr. Irvin's live scan results at the time of his hiring, and that Dr. Irvin had been convicted of two counts of disobeying court orders, one count of threatening crime with intent to terrorize, and one count of stalking.  Dr. Roman explained that the convictions were set aside and dismissed, and so they were not considered for purposes of employment.  When asked if those prior convictions for sex crimes would not be looked at during an investigation of sexual harassment allegations, Dr. Roman testified that "it's not our practice to go back and look at dispositions that were dismissed from years ago to make those kinds of conclusions about a complaint that's at hand before the office."

### b.    The Raquel Gonzalez testimony

Raquel Gonzalez was a student worker at Southwest College from the fall of 2015 until early 2018.  She worked for Johnel Barron, the outreach coordinator, visiting high schools and doing related outreach work.  She made an internal complaint about Mr. Barron, and when "[n]othing happened," in October 2017 she filed a sexual harassment lawsuit against Mr. Barron and the District that also named Dr. Irvin as a defendant.

Before Ms. Gonzalez testified, defense counsel described her as a "surprise witness" (though her name was on the witness

17

list) and asked to take her deposition.  The court allowed the deposition.

After Ms. Gonzalez's deposition, defendants sought to exclude her testimony and evidence of her claims and complaints, but the court allowed her testimony and admitted her complaint into evidence.

Before Ms. Gonzalez testified, the court discussed the issue with counsel.  The court stated that "Ms. Gonzalez's testimony paints quite a different picture of the college than has been portrayed by counsel of the college.  [¶]  Whether that's true or not is for the jury to determine, but I think the testimony is relevant on that subject.  Mr. Irvin was also involved in it, and to that extent—but that's also relevant."  Referring to Ms. Gonzalez's October 2017 lawsuit against Mr. Barron and Dr. Irvin, defense counsel stated that "just because she makes allegations, doesn't make them true."  The court responded, "That's why you have cross-examination."

Defense counsel argued that the testimony was not "me-too" evidence because the Gonzalez allegations "are so vastly different from that of [plaintiff]," in that Ms. Gonzalez was a student, in a completely different role than plaintiff, with allegations nothing like plaintiff's.  The court at first said, "It's really not a fair category as me-too evidence," and "what it is, is creating a picture that's quite different than what you have created in your case.  So what it's like to be . . . a student, a co-ed, innocent co-ed at the college.  And your picture is different than the plaintiff's picture.  [¶]  The juror—you can cross-examine Ms. Gonzalez.  Maybe she's making everything up.  Maybe you can prove that.  But the jury is entitled to know there is a different view."  And:  "So it's my view that this is relevant evidence, and it doesn't fall—neatly fall into any of the categories of me-too or somebody else or— [¶]  It's just like is this what the

18

college was?  Would I let my daughter go to the college?  . . .
[B]ut the point is the jury is entitled to hear that."

Defense counsel argued the testimony was "improper character evidence that is showing an inaccurate allegation of a propensity to harass, as opposed to actual facts," and repeated that Ms. Gonzalez was in a completely different role with allegations that were nothing like plaintiff's.  The court responded "in terms of looking at it with respect to the jury . . . . [¶]  [L]et's say I have a daughter, college age, and she wants to decide where am I going to go to college.  Okay.  Is this information that you would like her to have?  Is this information that you would like to have?  And then you could cross-examine her.  [¶]  [B]ut it does seem to be relevant on that."

Ms. Gonzalez then testified.  She explained her work for Mr. Barron.  She met Dr. Irvin when he began working at Southwest College; Dr. Irvin was Mr. Barron's direct supervisor and his office was next to Mr. Barron's office.  Several other student workers, mostly female, were also working for Mr. Barron.  Mr. Barron began to require them to wear skirts and high heels, and send him pictures of what they were going to wear the next day.  Two to three times a month, the group of workers would have informal meetings with Mr. Barron and Dr. Irvin in Dr. Irvin's office.

Ms. Gonzalez testified extensively about the ways Mr. Barron was inappropriate with female students who worked for him.  For example, Ms. Gonzalez testified that part of the job with Mr. Barron was that "you were expected to share as much as possible with him regarding your personal life."  "And I was expected to tell him, like, who I was dating, what type of person I was dating."

Ms. Gonzalez testified about frequent meetings among Mr. Barron, Dr. Irvin, and the female students who worked for

19

Mr. Barron. She testified: "And some of those conversations were shared in the meeting with Dr. Irvin during—at some times. And so Dr. Irvin knew what was going on in our office." Ms. Gonzalez testified that "these meetings still haunt me to this day." "So Dr. Irvin would sit here with his hand like this (indicating), one of his legs over his other leg, and he would go like—just push back and forth, like slowly, and just, like, laugh, like, you know, not a giggle, not openly laugh, but agreeing with the stuff that was being said." "And Mr. Barron would say, 'Oh, what do you think?' And he [Dr. Irvin] would, like agree with what Mr. Barron was saying. You know, you need a—'you don't know about love,' or 'you don't know about who to date,' and stuff like that. [¶] So, you know, I just think he—it was like he was entertained." "So that was basically the only way we interacted with Dr. Irvin. There was no other, like business matters that we would discuss with him."

"Mr. Barron actually, like, would teach us how to walk, like—so that we can attract a man, and then he would share this with Dr. Irvin. And, you know, like I said, Dr. Irvin was just entertained. He never stopped anything. He never stopped Mr. Barron and said, hey, that's kind of inappropriate for you to say. Nothing like that ever happened."

Ms. Gonzalez testified that at one of the meetings with Mr. Barron and Dr. Irvin, "[t]hey were talking about having a pool party at Dr. Irvin's house. And Mr. Barron was, like, oh, yeah, you guys should bring your bikinis, and we'll get in the pool. [¶] And Dr. Irvin followed saying, yeah, bring your bikinis, you know, stuff like that."

Ms. Gonzalez recounted how Mr. Barron suspended her after she brought her husband to a 50th anniversary gala, open to the public, to which Mr. Barron had told her "only you women can come." Ms. Gonzalez complained to "the Title IX person" at

20

the college, showing her text messages of a sexual nature between her and Mr. Barron. "Nothing happened from that complaint," and she then sued Mr. Barron, Dr. Irvin, and the District, preceded by an October 7, 2017 complaint to the Department of Fair Employment and Housing.

At plaintiff's request, the trial court took judicial notice that the Gonzalez complaint was filed in superior court and stated, "You may consider the fact that it was filed." The trial court admitted the complaint into evidence over defense objections, "to show that this complaint was filed and the statements were made in the complaint." The court further stated that "[t]his is being admitted for the purpose of showing that [the District] and Mr. Irvin had notice of this document as of this date, and made the allegations that they made."

Plaintiff's counsel then questioned Ms. Gonzalez about whether comments by Mr. Barron, alleged in her lawsuit, were made during the meetings with Dr. Irvin. The defense objected to reading any portion of the complaint; the court replied it had taken judicial notice, and asked defense counsel if he understood what judicial notice meant. Counsel replied, "Okay." Ms. Gonzalez then testified that Mr. Barron said several of the things that were alleged in her complaint during the meetings, in front of Dr. Irvin, and that Dr. Irvin was smiling when these things were said. An example is: " '[Mr. Barron] told the female employees that they shouldn't be out with boys, that they shouldn't f-u-c-k boys, fuck boys, because they don't know how to satisfy a woman.' " Another example is that Mr. Barron "told his female employees how they should walk like they had the best pussy out there.' " Ms. Gonzalez testified that these things were said to her and other female students by Mr. Barron "with Dr. Irvin in the room," and Dr. Irvin's reaction was to sit back and laugh.

Ms. Gonzalez testified that she filed the lawsuit "[b]ecause no one had done anything" and she "was still being harassed, still being threatened over the phone and being called" (by Mr. Barron), and she thought a lawsuit would put a stop to it. She testified that when Mr. Barron suspended her "and the whole lawsuit was filed and everything," she was moved to the college president's office, to work under Dr. Noldon's supervision. Dr. Noldon treated Ms. Gonzalez like a new employee and did not ask anything about the lawsuit. Ms. Gonzalez testified that she did not expect Dr. Irvin "to do anything because he was part of the behavior"; she was hoping Dr. Noldon would do something, but "[s]he didn't do anything either."

Dr. Noldon was questioned at length about her handling of Ms. Gonzalez's claims about Mr. Barron. Dr. Noldon testified, among other things, that she explained to Ms. Gonzalez what Ms. Gonzalez needed to do if she wanted to file a formal complaint.

Ms. Gonzalez testified that she dismissed her lawsuit because her original attorney clashed with another attorney in her firm and left the firm, but was unable to take cases with her, and found another attorney for Ms. Gonzalez. She spoke to the new attorney, "[a]nd then after that, it just became too much to do." "So I decided to just stop all this stuff back and forth and having to repeat myself and go over these traumatic experiences. It was – I was just trying to move on."

When asked about the Gonzalez complaint, Dr. Roman, the District's interim vice chancellor, testified it was "not the practice" to search for any sexual harassment lawsuits against the subject of the investigation; "[t]he practice is look at the facts on hand and make a determination whether or not the complaints rise to a level of sexual harassment."

### c.    Other evidence

As mentioned, many other witnesses testified on various points.  Among them was Denisha Hill, who was a student worker in 2017 and tutored at the Student Success Center.  She testified that plaintiff told her that Dr. Irvin sexually harassed her.  Plaintiff told her this at some time during the 2017 spring term.

Monrow Mabon represented Dr. Irvin in connection with the allegations that resulted in his misdemeanor convictions.  He testified that Dr. Irvin was never convicted of any sex crime, and that when a matter is expunged, "it's as if the event never occurred for all intents and purposes."  On cross-examination, plaintiff's counsel asked him if he represented Dr. Irvin "in a domestic violence case where he was alleged to hold a gun to his significant other, to her head," and Mr. Mabon responded, "I don't remember all the facts, but there is a probability that I did."  Then counsel asked if he represented Dr. Irvin in another case "where he was alleged to have broken the neck of the significant other."  Mr. Mabon responded that "the lines are a little bit blurred" after more than 20 years, "but I've had the opportunity to represent Mr. Irvin on issues and family matters in the past."  Plaintiff's counsel also questioned Mr. Mabon about sexual predators and grooming, over defense objections.

Plaintiff testified that after the District's response to her complaint, she had to continue to work with Dr. Irvin for four more years, until Dr. Irvin left the college.  She did not claim that any harassment occurred after October 2017.  Plaintiff testified extensively about her fears and the changes in her life as a result of the harassment.  She testified she was fearful; she dreaded going to work and seeing him on campus.  She stopped putting on workshops and stopped teaching a night class she had taught for 15 years because she did not feel safe at night.  Plaintiff testified

23

to the numerous activities she no longer participated in.  She saw a doctor twice a week for three weeks, but then stopped her sessions because talking about what had happened did not make her feel better and instead made her feel weaker.  She watches the clock all day and looks forward to going home, but also feels unsafe living alone for the first time in her life. Several other witnesses also testified about the change in plaintiff's spirit, her retreat into a shell, and the severity of her distress.

Over defense objections, the trial court referred to stalking in one of the jury instructions.  The jury was instructed: "[Plaintiff] claims that she was harmed by Dr. Howard Irvin, and [the District] is responsible for that harm because [the District] negligently hired, supervised, or retained Dr. Howard Irvin.  [¶] To establish this claim, [plaintiff] must prove all of the following: that [the District] hired Dr. Howard Irvin; that Dr. Howard Irvin had a history of stalking, which [the District] failed to consider in evaluating [plaintiff's] claim of sexual harassment; that [the District] knew or should have known that Dr. Howard Irvin wasn't fit and created a particular risk to others; and that [the District's] negligence in hiring a supervisor or retaining Dr. Howard Irvin was a substantial factor in causing [plaintiff's] harm."

The defense argued that the fact of the expungement "makes that unfair because it was—because of the expungement it was not something that was considered by [the District]."  The trial judge responded that judges and jurors "come with life experiences.  And when Ms. Gonzalez . . . was talking, I have a—a 17-year-old granddaughter who's now looking at colleges. . . . [¶]  If I had an 8- to 17-year old granddaughter who's now looking at colleges and actually is on the road as the case was going on, and the question was asked, and then down the road, turned out that there was some molestation and the college had known

24

about that, when they got the complaint and didn't do anything about it, I would be upset as a grandfather." The court concluded by saying, "That is my life situation right now. . . . So I think it's fair, I think the jury instruction as I asked it to be written is fair in the context of this case and what—what the argument is as to why that should have been considered. Whether the jury believes that or not, that's up to the jury."

In her closing argument, plaintiff's counsel began by telling the jury that, in addition to being compensated for harassment and retaliation, it was equally important to plaintiff to "stop[] Dr. Irvin from ever being around, alone, with female students." The District was responsible "because they knew that [Dr. Irvin] was sexually harassing other people. That he had a history, and they failed to take action." Counsel referred to "[Raquel] Gonzalez [*sic*], these prior stalking allegations that he had against him." She referred to Ms. Gonzalez more than 15 times in the course of her argument. At the end of her opening argument, she urged the jury to find that Dr. Irvin acted with "conscious disregard of the rights of Raquel Gonzales [*sic*], of students, of faculty, of [plaintiff]." In that event, "[w]e'll talk about how we make sure that he never goes to any college and is never alone with another woman again."

### d. The verdict and judgment

After deliberating for less than a day, the jury found in favor of plaintiff on each of her four claims. As to the District, the jury awarded plaintiff $8.5 million in noneconomic damages ($7 million for past mental suffering and emotional distress and $1.5 million for future mental suffering and emotional distress). As to Dr. Irvin, the jury awarded $1.5 million in noneconomic damages for past mental suffering and emotional distress. The jury found by clear and convincing evidence that Dr. Irvin acted

with malice or oppression, but in the punitive damages phase of the trial, the jury declined to award any damages.

Judgment was entered on the jury verdict on December 7, 2022.

### 5.  Postjudgment Proceedings

Defendants moved for a new trial, or in the alternative for remittitur.  Defendants argued the excessive noneconomic damages justified a new trial, or at least should be reduced by the court, and that evidentiary errors—improper admission of the newspaper articles and the evidence of Dr. Irvin's expunged convictions—were prejudicial and prevented defendants from receiving a fair trial.  Defendants argued that if the court issued a remittitur, it should be an award against the District "for no more than $150,000 in past noneconomic damages and $100,000 in future noneconomic damages, with no damages awarded against Dr. Irvin."

Defendants also moved for partial judgment notwithstanding the verdict, or in the alternative for remittitur, based on excessive damages.  The hearing on defendants' motions was held on February 15, 2023.  The trial court made comments at the hearing, and later in chambers, reflecting his personal feelings and perspectives about societal and civil rights advances of Black Americans and the progress our society has made respecting women in the workplace since he was a college student and then a young attorney decades ago.  At times during the hearing, Judge Draper appeared to become emotional and repeatedly described the personal effect the testimony had on him as a grandfather.

 Defendant was represented by new counsel for the posttrial proceedings, a Black woman, Janice P. Brown.  The District's attorneys included two women, one of whom is Black, but apparently, Ms. Brown was the only Black attorney at the

26

hearing on the posttrial motions. As described at length above, the case involved sexual harassment, retaliation, and related claims by a tenured professor. Race was not an issue in the case.

During the hearing, Judge Draper made many inappropriate remarks, including comments using racial terms. For example, Judge Draper stated that plaintiff and Dr. Irvin came from the same neighborhood: "And I use the term that my wife says is not politically acceptable. I think they are politically acceptable, because I use terms like coal black and light brown because I don't think those are bad terms."

Judge Draper asked Ms. Brown whether she had read the Robert Caro books about Lyndon Johnson, and Ms. Brown said she was not sure. Judge Draper continued: "This is not part of my decision at all. I'm just telling you. The reason that the South was able to stop civil rights for so long was the Southern senators who were against miscegenation, they called it. You know what 'miscegenation' is?" Ms. Brown responded: "I'm fully aware of that, Your Honor." Judge Draper stated: "Of course you are. That's my point. Both of the—when I went to Cal—and I'm sorry if I'm boring you, but when I went to Cal, my wife and I, we had seven really good black players all lined up at split end. And the idea of one of them playing quarterback would have been crazy." Judge Draper mentioned Doug Williams, and Ms. Brown stated that she was at that game. The court stated: "Both of the quarterbacks, who were spectacular quarterbacks, were the product of miscegenation. And the South would have had a lot better football team if the Southern senators had not–"
Ms. Brown then directed the court to the damages issues raised in defendants' posttrial motions.

During the afternoon session of the hearing, Judge Draper asked Ms. Brown whether she had "a date or something" when she checked her watch. In chambers, he repeated a line told to

female secretaries at law firms when he was a young lawyer: "You better be able to fuck better than you can type."

Near the beginning of the afternoon session of the hearing, Ms. Brown asked the judge why he thought Doug Williams (the first Black quarterback to start and win a Super Bowl) was relevant to the case. Judge Draper replied that it was not relevant. "It has to do with what I feel society has come to, and it's a good thing." Ms. Brown asked, "And what has society come to that—I mean, is there any relation to the case? I mean, you mentioned society has come to—what—having mixed Black men, I mean, the football players were mixed race?" Judge Draper said, "Yeah," and Ms. Brown asked why that has some meaning for the case.

Judge Draper responded: "You know, it doesn't have meaning for this case except that we're all a part of the world. We're all a part of our United States. And I'm very proud of our country. I'm very proud of how—75 percent of everybody were in favor of Black Lives Matter right after Floyd was—was done. Okay? Went back to the normal political but it's—it doesn't have anything to do with our case. [¶] We have two plaintiffs who couldn't say there was a racial issue in this case because they were both very Black people. Beautiful people, successful people, people I'm proud of. . . . So, no. To answer your first question is I can't do any better than that."

Ms. Brown then asked the trial court why he had mentioned the south and Black and mixed-race people not being accepted there. In response, Judge Draper mentioned Presidents Kennedy and Johnson in the context of the civil rights movement and getting the Civil Rights Act through. He mentioned his son-in-law's explanation for why southerners hate Lyndon Johnson. He then said, "I'm just sharing a little history with you. When

28

you get older, you like to share history.  It had absolutely nothing to do with my decision.  There was no racial issue in this case."

At the close of the hearing, the court denied both of defendants' motions.

Judge Draper's statements at the hearing led to a motion by defendants on March 3, 2023, to disqualify him for cause.  Judge Draper issued a lengthy "recusal order" finding there were no legal grounds for disqualification for cause but recusing himself from further proceedings in the case.  Among the observations made in his recusal order, Judge Draper said that, when he made the in chambers comment about female secretaries doing a better job in giving sexual favors than typing, he was trying to explain that this type of behavior was acceptable at some firms in his early years of practice, and "I felt it a mark of substantial progress that it was now widely and correctly recognized as totally unacceptable.  I thought this reference to historical progress would be considered a plus by Ms. Brown in an area her resume says is a vital interest of hers."

Judge Draper also said in his recusal order that his delight in Ms. Brown taking over defendants' representation "actually had nothing to do with 'ethnicity.'  While Ms. Brown[] identifies as African American, virtually every witness in this case, including[] particularly plaintiff Doctor Odom and defendant Doctor Irvin, were African Americans.  What impressed me, and encouraged me, about Ms. Brown[] taking over was that it had seemed clear to me that someone running the show at [the District], who I did not assume was [trial counsel], must have been brain-dead to allow the case to continue even after the showing of the first deposition.  [¶]  And I want to emphasize, after that statement, that this view was formed by me, but not expressed, solely based on the evidence I saw, starting with day one [o]f the trial.  It also was based in part on my own prior

29

professional experience." Judge Draper said it seemed to him the District had decided that "any ultimate loss will only be borne by people like me and everyone else in the courtroom, the taxpayers."

Defendants sought writ review, and this court directed the superior court to refer the disqualification motion to a neutral judge. On October 16, 2023, Orange County Superior Court Judge Cheri Pham disqualified Judge Draper, stating that the evidence defendants submitted "establishes that during the February 15, 2023 hearing, Judge Robert S. Draper made several irrelevant and inappropriate comments about race and gender. Defendants' attorney was the only African American person in the courtroom. Under these circumstances, and on the record presented, a person aware of the facts might reasonably entertain a doubt whether Judge Draper would be impartial." Judge Pham also observed that, in response to our alternative writ, Judge Draper had vacated his recusal orders, and there was no verified answer to defendant's disqualification motion; so the judge was deemed to have consented to his disqualification.

Judge Pham further concluded that Judge Draper was disqualified on February 15, 2023, when he made the inappropriate comments, before he had ruled on the motions, so his rulings on defendants' new trial and partial JNOV motions were void.

On December 18, 2023, the newly assigned trial judge, Judge Theresa M. Traber, ruled that the court had no jurisdiction under Code of Civil Procedure section 660, subdivision (c), to rule on defendants' postjudgment motions.

Meanwhile, on March 17, 2023, defendants filed a notice of appeal from the judgment and the postjudgment orders.

## DISCUSSION

Defendants do not claim that the verdict was not supported by substantial evidence, as indeed it was, in light of the extensive irrelevant and prejudicial evidence that never should have been admitted. Defendants challenge "the fairness of the trial given Judge Draper's bias, two prejudicial evidentiary rulings, and the excessiveness of the emotional distress award as a matter of law such that a new trial should have been granted."

As stated at the outset, and as discussed *post,* we conclude the evidentiary rulings at issue were manifestly erroneous and prejudicial. Before turning to that discussion, we briefly address and reject several other reasons plaintiff proffers for nevertheless affirming the judgment.

### 1. Plaintiff's Prefatory Claims

Plaintiff contends defendants forfeited any contention that there was not substantial evidence to support the verdict because "they did not fairly state all the evidence" as required by appellate rules in an appeal challenging the sufficiency of the evidence to support the verdict. However, as already noted, defendants do not argue that the verdict is not supported by substantial evidence. They challenge the fairness of a trial where the trial court, in postjudgment proceedings, made irrelevant and inappropriate comments about race and gender sufficient to result in his disqualification for cause, and where, during the trial, the court made evidentiary rulings that were a gross abuse of discretion. In short, while it is the duty of an appellant in a lack of substantial evidence case to present all the evidence supporting the verdict, that rule does not apply in the circumstances of this case.

Plaintiff also contends defendants forfeited the contention they should get a new trial because, when they filed their motion to disqualify Judge Draper, they did not request his

disqualification from trial of the case. But Judge Draper did not reveal any biases until after the verdict, in posttrial proceedings, and those revelations served only to enhance and suggest motivations for his erroneous and prejudicial evidentiary rulings.

2.      **The Times's Articles and Dr. Irvin's Decades-old Misdemeanor Convictions**

Defendants moved in limine before trial to exclude any evidence of Dr. Irvin's expunged misdemeanor convictions. As described above, Judge Draper admitted the 20-year-old newspaper articles, stating they were "not admitted for the truth," but only to explain plaintiff's reaction to reading them. But later the court stated that trial exhibit No. 19 (plaintiff's responses to Ms. Alford's questions with the articles attached) would be admitted "[t]o the extent the exhibit states [plaintiff's] belief and what she believed and what she saw." And, "[t]o the extent it states hearsay," the court admitted it "for her response from the request from the college."

The trial court's ruling in effect allowed the jury to consider the newspaper articles for their truth, notwithstanding their lack of admissibility as hearsay and the heavy weight of prejudice. Nowhere in the record do we find any Evidence Code section 352 analysis or balancing of the probative value and prejudicial effect of this evidence by Judge Draper.

Further, Judge Draper reasoned the jury could infer that Dr. Irvin was the person who slid the newspaper articles under plaintiff's office door, to intimidate her. But plaintiff's opposition to defendants' motion in limine made no claim that Dr. Irvin put the articles under her door, and the undisputed evidence at trial was that another employee, Roy Fontenot, slid the articles under her door, not to intimidate plaintiff but presumably to warn her. It thus appears Judge Draper developed the theory on his own

32

that Dr. Irvin may have slid the articles under plaintiff's door to intimidate her, an impermissible act of judicial advocacy.

"Prejudice, under [Evidence Code] section 352, refers to ' " ' " 'evidence which uniquely tends to evoke an emotional bias against the [moving party] as an individual *and which has very little effect on the issues*.' " ' " ' [Citation.] When the evidence at issue involves prior bad acts, substantial prejudice is inherent in the evidence and its admission requires 'extremely careful analysis.' The evidence should be examined pursuant to section 352. Generally, such evidence is admissible only if it has 'substantial' probative value." (*Argueta v. Worldwide Flight Services, Inc.* (2023) 97 Cal.App.5th 822, 837.)

Here, the prejudicial effect of the articles far exceeded any relevance to this case. Unlike the victim described in the 20-year-old articles, here there was no prior relationship between plaintiff and Dr. Irvin: no stalking, no restraining orders, no criminal charges. Plaintiff does not claim that Dr. Irvin ever touched or threatened her. He never showed plaintiff a gun or brought up the subject of guns; *plaintiff* is the one who kept bringing up the question whether he had a gun.

After the article describing Dr. Irvin's criminal trial in 1998 was admitted, the jury was left to decide whether the college was negligent in hiring or retaining Dr. Irvin in light of his misdemeanor convictions. The defense's explanation involved Dr. Roman's testimony about how and why live scans of a criminal record are used in the hiring process, and that misdemeanor convictions that are set aside or dismissed are not considered. (See p. 17, *ante.*) The District contends it could not rely on the 20-year-old misdemeanor convictions in making its hiring decisions because California law prohibits employers from considering expunged misdemeanor convictions in most circumstances. (Lab. Code, § 432.7, subd. (a)(1).) Yet, as

discussed *ante*, Judge Draper instructed the jury that the elements of plaintiff's claim of negligent hiring or retention included that Dr. Irvin had a history of stalking which the District failed to consider in evaluating plaintiff's claim of sexual harassment.

Plaintiff argues that it was defendants who put the live scan results in evidence during Dr. Roman's testimony, so they "have forfeited the issue" of the trial court's abuse of discretion in admitting evidence of Dr. Irvin's convictions. We think not. The District never should have been put in the position of having to explain to the jury why the college hired or retained Dr. Irvin despite the old convictions.

Plaintiff argues that even if there was error, it was harmless. To support this contention plaintiff cites *People v. Case* (2018) 5 Cal.5th 1, 41, where the court stated that "[t]he danger of undue prejudice is . . . lessened if evidence of the uncharged acts was 'no more inflammatory than the testimony concerning the charged offenses.' " Plaintiff asserts the content of the two newspaper articles "was no more inflammatory than all of the conduct [plaintiff] and the other harassed women outlined in their testimony." We cannot agree; the articles themselves clearly demonstrate otherwise.

Plaintiff also cites criminal cases finding admission of a prior offense to be harmless error, such as where a prior conviction was "a very small part of the People's case and was unlikely to have swayed the jury." (*People v. Washington* (2021) 61 Cal.App.5th 776, 789.) Those cases have no factual similarities to this one.

3.    **The Raquel Gonzalez Testimony**

We likewise conclude that the trial court erred in admitting the testimony from Ms. Gonzalez—a *student*—about her internal college complaint of sexual harassment against a *different*

administrator than Dr. Irvin, Johnel Barron, and the lawsuit she later filed, and dismissed, which included allegations against Dr. Irvin. Defendants objected to Ms. Gonzalez's testimony, arguing the internal college complaint she made was against Mr. Barron and did not name Dr. Irvin; her later-filed lawsuit which included claims against Dr. Irvin was inadmissible; Ms. Gonzalez as a student was not similarly situated to a faculty member like plaintiff; and her testimony was improper character evidence to show a propensity for harassment at the college.

"Courts have sanctioned the use of 'me too' evidence, which is evidence of an employer's alleged gender bias 'in the form of harassing activity against women employees other than the plaintiff' in certain circumstances." (*Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 96 (*Pinter-Brown*); *id.* at p. 89 [me-too evidence is "evidence that an employer waged the same type of discrimination against other employees as it did against a plaintiff"].) However, "[t]he 'me-too' doctrine . . . does not permit a plaintiff to present evidence of discrimination against employees outside of the plaintiff's protected class to show discrimination or harassment against the plaintiff. [Citation.] Although 'me too' evidence can be admissible to prove intent, motive, and the like with respect to the plaintiff's own protected class, it is never admissible to prove an employer's propensity to harass." (*Id.* at p. 96.) "Additionally, the admissibility of 'me too' evidence hinges on how closely related the evidence is to the plaintiff's circumstances and theory of the case." (*Id.* at p. 89.)

Here, even the trial court observed that the Gonzalez testimony was "really not a fair category as me-too evidence," and "it doesn't fall—neatly fall into any of the categories of me-too or somebody else . . . ." But the court allowed the testimony on the basis that it was relevant to show "what it's like to be . . . a

student, a co-ed, innocent co-ed at the college." Rather than me-too evidence, "It's just like is this what the college was? Would I let my daughter go to the college?" And, "Is this information that you would like [your college-age daughter] to have? Is this information that you would like to have?" Having expressed these personal opinions, Judge Draper placed no limits on the scope of Ms. Gonzalez's testimony. Ms. Gonzalez testified for well over half a court day.

Needless to say, the standard for admissibility of "me-too" evidence is not whether the information is something a parent would like to have in considering a college admissions decision. The evidence must be "closely related . . . to the plaintiff's circumstances and theory of the case." (*Pinter-Brown, supra,* 48 Cal.App.5th at p. 89.) Ms. Gonzalez was a student working at the school whose harassment claims were aimed at Mr. Barron. In her initial internal complaint, she did not even mention Dr. Irvin.

By contrast, plaintiff was a tenured faculty member and colleague of Dr. Irvin's, not a student worker. Her allegations of sexual harassment against Dr. Irvin were significantly different in kind from those in the Gonzalez complaint. Among other things, including repeated comments about her body, plaintiff alleged Dr. Irvin continually pressured her to have sex with him, and retaliated against her for refusing to do so by attacking her program and her staff. That "theory of the case" is entirely different from Ms. Gonzalez's testimony that *Mr. Barron* made inappropriate statements to students who worked with him. In short, Ms. Gonzalez was not similarly situated to plaintiff. We see no basis for admitting the evidence as "me-too" evidence and, as we have seen, the trial court did not either—despite admitting it to show "what it's like to be . . . a student, a co-ed, innocent co-ed at the college"—an inadmissible propensity theory.

36

The court failed entirely to analyze the admissibility of Ms. Gonzalez's testimony under Evidence Code section 352 and to consider the reasons for not admitting it. Admission of the Gonzalez testimony presented a classic abuse of discretion under section 352: it resulted in a minitrial on issues irrelevant to plaintiff's claims. The jury was likely to confuse Ms. Gonzalez's claims with those of plaintiff, which was encouraged by counsel's closing argument repeatedly referring to the Gonzalez testimony. The prejudicial effect is demonstrated by the outsize award of $10 million in noneconomic damages in a case where plaintiff's status at the college is unchanged and no economic damages were incurred.

Plaintiff insists the Gonzalez testimony was admissible to show notice to the District of Dr. Irvin's harassment, "in support of [plaintiff's] negligent supervision/retention and failure to prevent harassment claims," and also "for Gonzales' [*sic*] corroboration of interactions she observed between [plaintiff] and Irvin." As to the latter claim, plaintiff does not provide any record references to any such testimony.

The "notice" contention relates to the admission of the Gonzalez lawsuit into evidence. Plaintiff states she requested only that the court take judicial notice of the filing dates of the lawsuit and DFEH complaint. But plaintiff's counsel later moved the complaint into evidence over defense objections, and the court admitted it to show defendants "had notice of this document as of this date, and made the allegations that they made." Plaintiff then proceeded to question Ms. Gonzalez about whether comments her complaint alleged were made by Mr. Barron were made when Dr. Irvin was present, reading those allegations into the record (as described *ante,* at pp. 21-22).

This was inflammatory testimony, and Ms. Gonzalez testified a great deal more about Mr. Barron's behavior,

37

Mr. Barron's "prey[ing] on women," Mr. Barron's threats to end her career, her fear when she filed the lawsuit and at the time of her testimony, and her hopes that her testimony would result in Mr. Barron's removal from his position. None of this testimony was necessary to prove the District "received notice of Irvin's harassment before [plaintiff] complained." Plaintiff asserts the Gonzalez testimony was more probative than prejudicial, but our review of the record confirms the opposite.

Finally, plaintiff argues that even if admission of the Gonzalez evidence was an abuse of discretion (and it was), the error was harmless. She says defendants have not shown a miscarriage of justice because other evidence " 'directly implicated' " the District, and the Gonzalez testimony was not " 'central' " to the jury's verdict. As we have seen, the Gonzalez testimony was a significant part of the trial and was emphasized at closing argument. We are not persuaded the error was harmless, particularly in light of the size of the verdict.

**4.      Conclusion**

Defendants also contend that the jury's noneconomic damages awards, totaling $10 million, were excessive. Plaintiff continued to work at the District through the close of trial and had no economic damages. Defendants contend there is no precedent for this award absent economic or debilitating injuries, and the award was grossly disproportionate to awards in comparable cases.

We agree the excessive verdict is an additional reason why the case must be retried. The jury made those awards after hearing highly damaging evidence it should not have heard; a jury instruction that referred to proving Dr. Irvin's history of stalking; and closing arguments that emphasized the inadmissible evidence and the importance of stopping Dr. Irvin "from ever being around, alone, with female students."

On a final note, while we do not know whether, as defendants contend, Judge Draper's "persistent racial and gender bias" motivated his rulings at trial, we cannot rule out that possibility in light of the extreme and bizarre comments he made at the posttrial motions hearing and his ensuing disqualification for cause. We need not decide whether bias was the reason for his arbitrary and capricious evidentiary rulings; the rulings were an abuse of discretion irrespective of his motivations. One thing we can say for sure is, the rulings were not motivated by a devotion to the law of evidence.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court for a new trial. Defendants shall recover costs on appeal.


GRIMES, J.


WE CONCUR:



STRATTON, P. J.



WILEY, J.